# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**DAVID OTERO**,

       Plaintiff,

      vs.                                  No.    **CIV 06-1035 MCA/RHS**

**NATIONAL DISTRIBUTING
COMPANY, INC.**, and **GROUP
LONG TERM DISABILITY PLAN
FOR EMPLOYEES OF NATIONAL
DISTRIBUTING COMPANY, INC.**,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendants' Motion for Reconsideration on ERISA Count I* [Doc. 92] filed on July 11, 2008, *Plaintiff's Motion for Leave to File Surreply* [Doc. 103] filed on August 11, 2008, *Defendants' Motion for Summary Judgment* [Doc. 117] filed on October 17, 2008, and *Plaintiff's Motion for Leave to File Surreply Brief to Defendant's Motion for Summary Judgment* [Doc. 123] filed on December 28, 2008. Having considered the parties' submissions, the applicable law, and otherwise being fully advised in the premises, the Court denies Defendants' motion for reconsideration, denies as moot Plaintiff's motions for leave to file a surreply, and grants Defendants' motion for summary judgment for the reasons set forth below.

## I.    BACKGROUND

The history of this litigation is set forth in the *Memorandum Opinion and Order* [Doc. 61] filed on August 27 2007, and the *Memorandum Opinion and Order* [Doc. 89] filed on

July 1, 2008.  As a result of those rulings, National Distributing Company, Inc. and its Group Long Term Disability Plan are the only remaining Defendants in this action, and the only remaining claim is for equitable relief to remedy the alleged breach of a fiduciary duty under the Employee Retirement Income Security Act (ERISA), as requested in Count I of Plaintiff's *Second Amended Complaint.*  [Doc. 62.] Accordingly, the Court vacated the jury trial that was previously scheduled in this matter and reset Plaintiff's remaining ERISA claim for a bench trial. [Doc. 89.]

The *Memorandum Opinion and Order* [Doc. 89] filed on July 1 2008, rejected Defendants' argument that Plaintiff's ERISA claim should be dismissed on the grounds that it is precluded under the Rooker-Feldman doctrine and principles of *res judicata*.  The Court concluded that in the context of prior rulings by a state court in an action that is subsequently removed to federal court, the proper preclusion doctrine is the "law of the case" rather than *res judicata* or the Rooker-Feldman doctrine.   The Court also concluded that even if the Defendants had raised the correct preclusion doctrine in their motion, it would not apply to the remaining ERISA claim.

On July 11, 2008, Defendants filed a motion for reconsideration in which they assert, for the first time, that the doctrine of "law of the case" should apply to the state court's order dismissing Defendant National before this action was removed to federal court and before Plaintiff was permitted to amend his complaint a second time.  [Doc. 92.]  Defendant's motion for reconsideration also presents an alternative argument that Defendant cannot prevail on the merits of his remaining ERISA claim.

2

On October 17, 2008, Defendants filed a motion for summary judgment in which they presented additional evidence to support their assertion that Plaintiff cannot prevail on the merits of his ERISA claim.  Citing his own version of the facts, Plaintiff opposes both Defendants' motion for summary judgment and their motion for reconsideration.  Plaintiff also filed a motion seeking leave to file a surreply. [Doc. 103.]

The undisputed facts and evidence of record regarding the pending motion for summary judgment can be summarized as follows.  Plaintiff began working for Defendant National on March 20, 2000. [Ex. J to Doc. 117-13.]  He did not apply for long-term disability coverage when he began employment or during the company's annual enrollment periods in 2000, 2001, or 2002.  [Juarez Dep. at 48, Ex. 11 to Doc. 118-12.]

In August 2002, Plaintiff was diagnosed with a permanent, chronic disease of the kidney and referred to a specialist after having his condition confirmed by a renal biopsy. [Ex. D to Doc. 117-7; Ex. 16 to Doc. 118-17.]  After receiving this diagnosis and undergoing treatment, Plaintiff completed a "2004 Enrollment Form" dated November 25, 2003, in which he applied for coverage under the National Distributing Company, Inc. Long-Term Disability Plan (hereinafter "the Plan"). [Ex. A to Doc. 117-3.] Although Plaintiff has submitted an affidavit stating that he was told such coverage would take effect immediately [Otero Aff. ¶ 3, Ex. 1 to Doc. 118-2], the terms of the Plan provided that January 1, 2004, was the first day of coverage available to those who enrolled for the first time during the

open enrollment period that began in November 2003. [Plan at 4-5.[1]]  The Plan also

contained language limiting eligibility for benefits based on pre-existing conditions.  [Plan

at 11.]

At the time Plaintiff was given the "2004 Enrollment Form," he also was given a

"2004 Benefits Enrollment Guide" (hereinafter "the Guide").  [Otero Dep. at 64-65, Ex. G

to Doc. 117-10.] The Guide states that: "If you have any questions about any of your

benefits, please contact the company that handles the plan administration for NDC." [Ex. K

to Doc. 117-14, at 9.] In addition to providing a telephone number for "Human Resources"

at Defendant National's Atlanta headquarters, the Guide then lists the name, web address,

and telephone number of  the company's long-term disability insurance provider, *i.e.*, "the

Hartford." [Id.] Following this listing, the Guide states that:

> This Guide describes the benefit plans and policies available to you as
> an employee of NDC.  The details of these plans and policies are contained in
> the official plan and policy documents, including some insurance contracts.
> This guide is meant only to cover the major points of some of the plans or
> policies.  It does not contain all of the details that are included in your
> summary plan description.
>
> If there is ever a question about one of these plans or policies, or if there
> is a conflict between the information in this guide and the formal language of
> the plan or policy documents, the formal wording in the plan or policy
> documents will govern.

[Id.]  Defendant National's "Employee Handbook" similarly states that:

> The Company provides covered employees with Summary Plan

---

[1]The Plan language cited herein is included in the record as part of the *Supplement to Notice of Removal* [Doc. 3], and as exhibits to the briefing on Defendants' *Motion for Summary Judgment* [Ex. B to Doc. 117-4; Ex. B-1 to Doc. 117-5.]

Description booklets and other materials related to its LTD plan.  In the event
of a conflict, the insurance contract or plan documents will prevail over other
documents.  You may obtain assistance or additional information regarding
these programs from Human Resources.

[Ex. 14 to Doc. 118-15, at 3.]

In his deposition testimony, Plaintiff admits that he "probably" read the Guide before signing the enrollment form, but he never called the "Human Resources" number listed therein or contacted the Hartford. [Otero Dep., Ex. G to Doc. 117-10, at 66-67.] And while acknowledging the existence of the "Employee Handbook," Plaintiff has not submitted any evidence that he actually consulted it on this issue. [Doc. 118, at 8.]  Instead of turning to those sources, Plaintiff states that he relied on Valerie Juarez, the Human Resources Director of Defendant National's local office in Albuquerque. [Otero Dep., Ex. 2 to Doc. 118-3, at 178; Daws Dep. at 35, Ex. P to Doc. 117-19.]

Ms. Juarez assisted Plaintiff in completing a "Request for Leave Form" dated December 9, 2003, which Plaintiff signed on that date. [Ex. C to Doc. 117-6; Ex. 6 to Doc. 118-8.]  This form indicates that Plaintiff initially requested leave for the period from December 10, 2003, until February 10, 2004, because of his "serious health condition"; the form also indicates that Plaintiff intended to return to work after the end of this requested leave period. [Id.] Ms. Juarez sent an e-mail message to her supervisors advising them of this request.  [Ex. 4 to Doc. 118-5.]

In addition to the leave request form and e-mail message, the evidence of record contains a letter from Ms. Juarez dated December 9, 2003, informing Plaintiff that his initial

request for leave was "granted subject to the terms and conditions of our FMLA policy and the enclosed documents." [Ex. 3 to Doc. 118-4.]  The documents enclosed with this letter included a number of forms that Plaintiff was required to return with information supplied by his health care provider.

While the main focus of Ms. Juarez's letter of December 9, 2003, is to supply instructions for returning these forms, the letter also stated that:  "You are also eligible to apply for long-term disability if the need arises." [Id.]  This statement was made in the context of the information supplied in Plaintiff's "Request for Leave Form," which indicated that he intended to return to work after completing his leave period ending on February 10, 2004.  [Ex. C to Doc. 117-6, referenced in Ex. 3 to Doc. 118-4, and Ex. 6 to Doc. 118-8.]

One of the documents that Plaintiff was asked to return shortly after beginning his FMLA leave on December 10, 2003, was a "Certificate of Health Care Provider Form" filled out by one of his doctors, which stated (among other things) that "Mr. Otero suffers from severe edema making it difficult to walk and drive for extensive periods of time." [Ex. 16 to Doc. 118-17; Ex. D to Doc. 117-7.]  Plaintiff explained in his deposition testimony that he went on leave during this period because his doctors instructed him that he could not work. [Otero Dep. at 125-26, 143, 147, Ex. G to Doc. 117-10.]

Plaintiff also was required to provide his employer with periodic status reports pursuant to the FMLA policy summarized in Ms. Juarez's letter of December 9, 2003.  [Ex. 3 to Doc. 118-4.] Plaintiff returned his first "Status Report Form" on January 20, 2004.  [Ex. E to Doc. 17-8; Ex. 7 to Doc. 18-8.]  In contrast to the "Leave Request Form" that Plaintiff

6

previously submitted on December 9, 2003, this "Status Report Form" dated January 20, 2004, indicates that Plaintiff "will <u>not</u> be returning to work." [Id.] Again, Plaintiff's deposition testimony further indicates that the reason for this change in status was that his doctors instructed him that he could not work.  [Otero Dep. at 125-26 143, 147, Ex. G to Doc. 117-10.]

After receiving the "Status Report Form" dated January 20, 2004, Ms. Juarez wrote a letter dated February 3, 2004, which Plaintiff had requested for purposes of filing for Social Security coverage. [Juarez Dep. at 27, Ex. I to Doc. 117-12.] Ms. Juarez's letter of February 3, 2004, is addressed "To Whom It May Concern"; there is no indication that it was intended to be sent to the Plan's long-term disability insurance carrier, the Hartford, or that it was intended to assist Plaintiff in filing a claim for long-term disability benefits under the Plan. [Ex. L to Doc. 117-15; Ex. 8 to Doc. 118-9.]  There is also no evidence that Plaintiff ever requested a claim form to apply for such benefits under the Plan, or that Ms. Juarez provided him with one.  Nevertheless, Ms. Juarez's letter does state, among other things, that Plaintiff "will become eligible for Long Term Disability Insurance Pay at 60% of his previous average gross annual income of $40,000" on March 5, 2004.  [Id.]

Ms. Juarez's letter of February 3, 2004, also indicates that Plaintiff's "last check from NDC will be dated February 13, 2004," shortly after the expiration of the leave period that Plaintiff originally requested on December 9, 2003.  [Id.] In that last check, Ms. Juarez included a deduction for the amount of the estimated premium ($17.04) that she thought Plaintiff would be charged if he were covered under the Plan.  [Ex. H to Doc. 117-11; Ex.

9 to Doc. 118-10; Juarez Dep. at 38, Ex. I to Doc. 117-12.]  At the time of Plaintiff's last

check, however, Ms. Juarez had not yet received instructions from the company's corporate

headquarters, and when she was later informed that Plaintiff was not eligible for coverage,

she issued a refund check dated April 9, 2004, for the $17.04 previously charged for this

purpose.  [Ex. H to Doc. 117-11; Juarez Dep. at 38, 40-41.]  Plaintiff elected not to negotiate

this refund check.  [Otero Aff. ¶ 7, Ex. 1 to Doc. 118-2.]

　　　After receiving Ms. Juarez's letter dated February 3, 2004, and his last paycheck,

Plaintiff provided another "Certification of Health Care Provider Form" dated March 9,

2004, and another "Status Report Form" with the same date.  This "Status Report Form"

again states that Plaintiff "will not be returning to work." [Ex. N to Doc. 117-17.]  The

"Certification of Health Care Provider Form" further states that the patient "cannot complete

any work at this time." [Ex. O to Doc. 117-16.]

　　　Plaintiff never returned to work and Defendants terminated Plaintiff's employment

effective March 26, 2004.  At some point before that date, he met with Ms. Juarez and was

told that his employment was being terminated and he was not eligible for long-term

disability benefits under the Plan.  [Otero Dep. at 137-38, Ex. G to Doc.117-10; Otero Dep.

at 180-81, Ex. 2 to Doc. 118-3.]  Plaintiff thought that the reason given for his ineligibility

at that time was "a preexisting disease or something." [Otero Dep. at 181, Ex. 2 to Doc. 118-

3.] After receiving this information, Plaintiff consulted with his attorney, who wrote a letter

dated March 25, 2004, demanding that Plaintiff be paid long-term disability benefits

amounting to 60% of his pre-disability earnings.[2] [Ex. 10 to Doc. 118-11.]

Defendants responded in a letter dated June 17, 2004, asserting that Plaintiff "is not eligible for Plan coverage because he does not meet eligibility requirements for Plan participation." [Ex. 12 to Doc. 118-13.] As stated in the Court's prior *Memorandum Opinion and Order* [Doc. 61], the rationale for this conclusion rests on the "Deferred Effective Date" section of the Plan, which states that:

> If you are absent from work due to:
> 1. accidental bodily injury;
> 2. sickness;
> 3. pregnancy;
> 4. Mental Illness; or
> 5. Substance Abuse,
> on the date your insurance or increase in coverage would otherwise have become effective, your effective date will be deferred.  Your insurance, or increase in coverage will not become effective until you are Actively at Work for one full day.

[Plan at 5.]  The "Definitions" section of the Plan defines "Actively at Work" as follows:

> You will be considered to be actively at work with your Employer on a day which is one of your Employer's scheduled work days if you are performing in the usual way, all of the regular duties of your job on a Full-time basis on that day.  You will be deemed to be actively at work on a day which is not one of your Employer's scheduled work days only if you were actively at work on the preceding scheduled work day.

[Plan at 16.]

Applying this language from the Plan to the facts of Plaintiff's case, Defendants concluded that January 1, 2004, was the date Plaintiff's insurance "would otherwise have

---

[2]The Court notes that the certified mail receipt for this letter is postmarked March 25, 2004, but there is no delivery date on the return receipt.  Therefore, it is possible that the letter was not received in time for Plaintiff to have worked a full day before his termination date.

become effective," because that was the first day of coverage available to those who enrolled for the first time during the open enrollment period in November 2003.  But Plaintiff was "absent from work" due to sickness on the otherwise effective date of January 1, 2004, because he had already begun his leave the previous month, and he never returned to work for one full day thereafter.  Thus, according to the "Deferred Effective Date" language quoted above, Plaintiff never became eligible for coverage under the Plan.

Plaintiff now states that he would have attempted to return to work for one full day if he had known of the "Deferred Effective Date" provisions of the Plan.  He further claims that the reason he did not attempt to return to work was that, based on Ms. Juarez's representations, he thought he was already covered under the Plan.  [Otero Dep. at 176-82, Ex. 2 to Doc. 118-3.]

## II.   ANALYSIS

### A.    Defendants' Motion for Reconsideration

The Federal Rules of Civil Procedure do not expressly recognize "motions for reconsideration," and thus courts typically review such motions by analogy to Rule 59(e), which allows for a "motion to alter or amend a judgment" within ten days after entry of the judgment.  Fed. R. Civ. P. 59(e); see Computerized Thermal Imaging, Inc. v. Bloomberg, L.P., 312 F.3d 1292, 1296 n.3 (10th Cir. 2002).  The analogy is strained in this instance, because Defendants seek reconsideration of an interlocutory ruling rather than a "judgment." In any event, "Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the

10

apple.'" <u>Sequa Corp. v. GBJ Corp.</u>, 156 F.3d 136, 144 (2d Cir. 1998).  "It is generally accepted that a party may not, on a motion for reconsideration, advance a new argument that could (and should) have been presented prior to the district court's original ruling." <u>Cochran v. Quest Software, Inc.</u>, 328 F.3d 1, 11 (1st Cir. 2003).

In this case, Defendants' motion for reconsideration is premised on a new argument that the Court should have applied the "law of the case" doctrine.  This argument could have been presented in Defendants' original motion, and the Court's prior ruling already considered the "law of the case" doctrine.  Thus, rather than pointing out an error in the Court's prior ruling, Defendants belatedly attempt to correct their own error in relying on the wrong preclusion doctrines in their original motion papers.  Under the authorities cited above, such a "second bite at the apple" is not permitted.

In their motion for reconsideration, Defendants also present an alternative argument to support their position that Plaintiff's ERISA claim must fail on the merits. [Doc. 92.] The parties' response and reply briefs attach evidence to dispute this alternative argument. [Doc. 96, 100.]  Such evidence, however, is not relevant to the original motion on which Defendants seek reconsideration, for that motion sought dismissal based on the narrower grounds of *res judicata*, the Rooker-Feldman doctrine, or the failure to state a claim based on Plaintiff's pleadings alone. [Doc. 66, 68.]

A motion for reconsideration is not the proper vehicle for transforming a motion to dismiss on these narrower grounds into a motion for summary judgment on the merits.  "Rule 59(e) motions are aimed at *re*consideration, not initial consideration."  <u>Harley-Davidson</u>

Motor Co., Inc. v. Bank of New England, 897 F.2d 611, 616 (1st Cir.1990) (citing White v. New Hampshire Dep't of Employment Security, 455 U.S. 445, 451 (1982)).  Accordingly, Defendants' motion for reconsideration is denied.

As the Court does not consider the evidence cited for the first time in the briefing on Defendant's motion for reconsideration, there is no need for Plaintiff to file a surreply regarding such evidence.  Plaintiff's motion for leave to file a surreply is therefore denied as moot.  The parties' arguments and evidence on the merits are instead considered in light of the briefing on the subsequently filed motion for summary judgment.

### B.    Defendants' Motion for Summary Judgment

#### 1.    Standard of Review

Ordinarily, judicial review of ERISA claims for denial of benefits is not governed by the summary-judgment standard articulated in Fed. R. Civ. P. 56, but is instead treated like an appeal from the decision of an administrative agency based on the record compiled before that agency.  See, e.g., Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517-18  (1st Cir. 2005).  In the present case, however, the Court already has determined that judicial review of an ERISA claim for denial of benefits is unavailable at this juncture.  [Doc. 89.]  As a result of Defendants' determination that Plaintiff was not eligible for coverage, Plaintiff never had the opportunity to submit such a claim to the insurance company and exhaust its administrative remedies.  The Court also has determined that the unavailability of a claim for recovery of benefits under 29 U.S.C. § 1132(a)(1)(B) at this juncture means that Plaintiff must instead rely on the provision for appropriate equitable relief in 29 U.S.C. § 1132(a)(3)

which our Supreme Court discussed in <u>Varity Corp. v. Howe</u>, 516 U.S. 489, 515 (1996).  The

Tenth Circuit has reviewed such claims for equitable relief under the summary-judgment

standard.  <u>See</u> <u>Miller v. Coastal Corp.</u>, 978 F.2d 622, 623 (10th Cir. 1992); <u>Horn v. Cendant</u>

<u>Operations, Inc.</u>, 69 Fed. Appx. 421, 426 (10th Cir. 2003) (unpublished disposition).

 Summary judgment under Fed. R. Civ. P. 56(c) "should be rendered if the pleadings,

the discovery and disclosure materials on file and any affidavits show that there is no genuine

issue as to any material fact and that the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c).  "When a motion for summary judgment is properly made and

supported, an opposing party may not rely merely on allegations or denials in its own

pleading . . . ." Fed. R. Civ. P. 56(e)(2).  Rather, the nonmoving party's response " must--by

affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue

for trial." <u>Id.</u>  Judgment is appropriate "as a matter of law" if the nonmoving party has failed

to make an adequate showing on an essential element of its case, as to which it has the

burden of proof at trial.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Adler</u>

<u>v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 670-71 (10th Cir. 1998).

 The Local Rules provide that briefing is completed upon the filing of a motion, a

response, and a reply.  <u>See</u> D.N.M. LR-Civ. 7.6, 56.1.  When, as here, a movant submits

additional evidence in support of summary judgment after the filing of the non-movant's

response, district courts have the option of either disregarding that additional evidence or

providing the  non-movant with the opportunity to file a surreply.  <u>See</u> <u>Beaird v. Seagate</u>

<u>Tech., Inc.</u>, 145 F.3d 1159, 1163-65 (10th Cir. 1998).  The filing of a surreply requires leave

of the Court, see D.N.M. LR-Civ. 7.6(b), and in this instance, the Court elects not to grant leave to file a surreply regarding this motion, as the material facts are already covered in the evidence submitted before Defendant's reply brief was filed.   In addition to denying Plaintiff's motion for leave to file a surreply, the Court will disregard any evidence presented for the first time with Defendants' reply brief.

In order to warrant consideration by the Court, the remaining factual materials accompanying the parties' briefs must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial). See Celotex, 477 U.S. at 324. "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'" Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir.1991)).   Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion. Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995) (applying this rule to inadmissible hearsay testimony in depositions).

The hearsay rule applies to unsworn opinions by expert witnesses or treating physicians.   Such unsworn opinions "'do[ ] not meet the requirements of Fed. Rule Civ. Proc. 56(e)' and cannot be considered by a district court in ruling on a summary judgment motion." Carr v. Tatangelo, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) (quoting Adickes v. S.J. Kress & Co., 398 U.S. 144, 158 n.17 (1970)); accord Fowle v. C & C Cola, 868 F.2d 59,

14

67 (3d Cir. 1989); see Sofford v. Schindler Elevator Corp., 954 F. Supp. 1459, 1462-63 (D. Colo. 1997) (collecting cases).  The Court also may refuse to consider expert opinions that are not timely disclosed under the Court's discovery rules, which are designed to give an opposing party a fair opportunity to challenge the admissibility of the proffered expert opinion on grounds articulated in Daubert v. Merrell-Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993), and its progeny.   See Fed. R. Civ. P. 37(c)(1); Gutierrez v. Hackett, 131 Fed. Appx. 621, 625-26 (10th Cir. 2005) (unpublished disposition citing Jacobsen v. Deseret Book Co., 287 F.3d 936, 953 (10th Cir.2002)).  For these reasons, the Court does not consider the physician's letter submitted as Ex. 17 to Doc. 118-18.

On the other hand, the Court can consider unsworn statements offered for non-hearsay purposes.  For example, such statements may be considered for the limited purpose of showing their effect on the listener or the declarant's state of mind.  See Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993) (effect on the listener); Wright v. Southland Corp., 187 F.3d 1287, 1304 n.21 (11th Cir. 1999) (declarant's state of mind). They also may be considered as verbal acts or operative facts when legal consequences flow from the utterance of the statements.  See generally Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087 (10th Cir. 2001).

Apart from the limitations discussed above, it is not the court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most

favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

### 2.    Plaintiffs' Alternative Theories for Seeking Equitable Relief

In this case, the Court has explained in a prior ruling [Doc. 89] that informal communications between Plaintiff and Defendants' alleged agents could not modify the written terms of the Plan.  See Miller, 978 F.2d at 624; Straub v. Western Union Telegraph Co., 851 F.2d 1262, 1265  (10th Cir. 1988).  The Court already has interpreted the plain language of the Plan to mean that the insurance coverage for which Plaintiff applied at some point during the Annual Enrollment Period between October 1,  2003, and December 1, 2003, could not become effective until the first day of the following month, *i.e.*, January 1, 2004.  [Plan at 4-5.]   The Plan further provides that if Plaintiff was absent on his first scheduled workday in January 2004 due to sickness, then such coverage could not become effective until the first day thereafter on which Plaintiff was actively at work for one full day. [Plan at 5, 16.]

Thus, the question presented by Defendant's motion for summary judgment is not whether--as a matter of law--these requirements for determining the effective date of coverage are part of the Plan, but whether–as a matter of equity--Plaintiff should be excused from performing as required under the Plan (*i.e.*, returning to work for one full day on or after January 1, 2004), because Defendants' agents allegedly told him he did not have to do so in order to obtain coverage.  To support such an equitable remedy, Plaintiff presents three alternative theories:    equitable estoppel, contract reformation, and injunction or

16

"instatement." [Doc. 117.]   For the reasons set forth below, I conclude that Plaintiff's theories of contract reformation and injunction or "instatement" do not apply here.

The authority cited in support of Plaintiff's alternative theory of contract reformation is inapposite because this is not a fraudulent inducement case or one in which there was a scrivener's error in drafting the Plan documents.  See  De Pace v. Matsushita Elec. Corp. of Am., 257 F. Supp. 2d 543, 566-67 (E.D.N.Y. 2003) (collecting cases recognizing a reformation theory).  Unlike the facts in De Pace, the evidence of record in the present case does not support a theory that Plaintiff was induced by his employer to retire under a particular benefit package that later turned out to be different than what was represented at the time of the inducement.  Here Plaintiff chose to apply for long-term disability coverage *after* he had been diagnosed with a serious medical condition, and it was Plaintiff's *doctors*, rather than his *employer*, who told him he could not work.  Defendants and their agents were simply reacting, albeit mistakenly in some instances, to a process that Plaintiff and his doctors initiated.

The authority cited in support of Plaintiff's alternative theory of injunction or "instatement" has more relevance but still differs significantly from the fact pattern presented here.  Courts have granted injunctive relief to "instate" coverage when such coverage has been denied as a result of the employer's failure to provide or transmit the required forms for enrolling in a benefits plan, and the employee has made timely, reasonable efforts to inform the employer of his or her request for such coverage.  See, e.g., Atwood v. Swire Coca-Cola, USA, 482 F. Supp. 2d 1305, 1315-17 (D. Utah 2007).  In such instances, the employee's

17

failure to perform as required under a benefits plan is excused insofar as it was induced by the employer's inequitable conduct in failing to provide or process the required forms in a timely manner.

But unlike the facts in Atwood, the stated rationale for Defendants' denial of coverage in this instance was not a failure to submit an enrollment form in a timely manner.  Rather, Defendants' stated rationale at the time of this denial was based on the "Deferred Effective Date" provisions of the Plan (as articulated in the letter of June 17, 2004 attached as Ex. O to Doc. 117-18), or the "Pre-Existing Conditions Limitations" provisions (as suggested by Page 181 of Plaintiff's deposition testimony attached as Ex. 2 to Doc. 118-3).[3]  Both of these rationales depend on Plaintiff's actual conduct or the actual conditions reported by his health-care providers, rather than the mere formalities of filling out paperwork.

### 3.    Plaintiff's Theory of Equitable Estoppel

Having rejected Plaintiff's theories of reformation and injunction, the Court next turns to Plaintiff's theory of equitable estoppel.  The parties have cited no published authority from the Tenth Circuit recognizing a claim for equitable estoppel under these circumstances; instead they only point to dicta indicating that our Circuit would leave open the possibility of such a claim in particularly "egregious" cases involving "lies, fraud or an intent to deceive." Callery v. U.S. Life Ins. Co., 392 F.3d 401, 407 (10th Cir. 2004) (quoting Miller, 978 F.2d at 625, and citing Kaus v. Standard Life Ins. Co., 176 F.Supp.2d 1193, 1198-99

---

[3]The Court does not consider Defendants' alternative justification based on the 30-day continuous service requirement of the Plan, because the parties have cited no evidence to show that justification was proffered at the time coverage was denied.

(D.Kan.2001)).

In the very narrow circumstances in which other circuits have recognized an equitable estoppel claim in the context of ERISA litigation, the elements of such a claim are as follows:

> "(1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation."

Cannon v. Group Health Serv. of Okla, Inc., 77 F.3d 1270, 1276-77 (10th Cir. 1996) (quoting National Co. Health Benefit Plan v. St. Joseph's Hosp. of Atlanta, Inc., 929 F.2d 1558, 1572 (11th Cir. 1991).

There is some degree of overlap between these elements and the "breach of fiduciary duty" claim discussed in the Tenth Circuit's unpublished disposition in Horn, 69 Fed. Appx. at 428-29.  The latter claim also involves the notion that "[e]mployees cannot be bound to policy terms for which they received no notice."  Id. at 428 (citing Member Servs. Life Ins. Co. v. Am. Nat'l Bank & Trust Co. of Sapulpa, 130 F.3d 950, 956 (10th Cir. 1997), and Bartlett v. Martin Marietta Operations Support, Inc. Life Ins. Plan, 38 F.3d 514, 517 (10th Cir. 1994)).  Similarly, "[a] fiduciary's misrepresentation or failure to disclose is material 'if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed . . . decision.'"  Id. (quoting Jordan v. Fed. Express Corp., 116 F.3d 1005, 1015 (3d Cir. 1997)).

In the present case, Ms. Juarez's initial letter of December 9, 2003 [Ex. 3 to Doc. 118-

19

4], does not contain such a misrepresentation because it was based on the assumption, stated in Plaintiff's original leave request [Ex. C to Doc. 117-6], that he intended to return to work after his requested FMLA leave period expired on February 10, 2008.  So long as Plaintiff intended to return to work at the end of his requested period of FMLA leave, the "Deferred Effective Date" provisions of the Plan would not present an obstacle to obtaining long-term disability coverage, because his return to work on that date would have triggered such coverage, and upon returning to work he could thereafter apply for benefits if the need arose.

On January 20, 2004, however, Plaintiff presented a "Status Report Form" in which he indicated that he "will <u>not</u> be returning to work."  [Ex. E to Doc. 117-8.]  Taken in the context of this significant change in Plaintiff's status, Ms. Juarez's subsequent letter dated February 3, 2004, is clearly in conflict with the Plan language when it states that, on March 5, 2004, Plaintiff "will become eligible for Long Term Disability Insurance Pay at 60% of his previous average gross annual income of $40,000."  [Ex. 8 to Doc. 118-9.]  Without a return to work, Plaintiff had no way of triggering the "Deferred Effective Date" provisions of the Plan, and thus Ms. Juarez's letter of February 3, 2004, is inaccurate.

The question then becomes whether Plaintiff was entitled to rely on Ms. Juarez alone, even though both the Guide [Ex. K to Doc. 117-14] distributed concurrently with his 2004 Enrollment Form and the Employee Handbook [Ex. 14 to Doc. 118-15] cited in his response to Defendants' motion for summary judgment contain clear language to the effect that the Plan documents prevail over other documents and should be consulted with respect to the details of coverage.  This additional language in the Guide and Employee Handbook, as well

20

as the existence of the Plan documents to which they refer, distinguish this case from fact patterns like <u>Horn</u>, 69 Fed. Appx. at 428-29, where the relevant plan documents did not exist at the time the employee needed to take the steps necessary to satisfy preconditions for coverage, and thus the employee had no choice but to rely on incomplete or inaccurate information communicated in a booklet or by human-resources staff.

The Court cannot ignore the references to the Plan documents in the Guide and Employee Handbook and simply hold that Plan documents are overridden by informal communications from human-resources staff or brochures in every instance.  To do so would be contrary to the rule expressed in <u>Miller</u>, 978 F.2d at 625, that an "employee benefit plan cannot be modified . . . by informal communications, regardless of whether those communications are oral or written."  <u>Id.</u> (citations omitted).  Failing to give effect to an employer's attempt to refer its employees to plan documents also would undermine one of the central goals of ERISA, which is to encourage "'reliance on the face of written plan documents.'"  <u>Members Serv. Life Ins. Co.</u>, 130 F.3d at 957 (quoting <u>Curtiss-Wright Corp. v. Schoonejongen</u>, 514 U.S. 73, 83 (1995)).

Thus, for purposes of asserting a claim for breach of fiduciary duty premised on an equitable estoppel theory, the available precedents suggest that it is not reasonable or equitable for employees to disregard their employer's clear attempts to refer them to Plan documents, unless they can show  "particularly egregious" circumstances involving "lies, fraud, or intent to deceive." <u>Miller</u>, 978 F.2d at 625.  For example, if the Plan documents did not exist (as in <u>Horn</u>), or if the employer denied an employee's specific request for access

to such documents, then the employer's reference to those documents would be illusory.

Plaintiff has not presented evidence to support such an egregious scenario here. He acknowledges receiving the Guide but does not assert that he requested the Plan documents referenced therein. He also does not assert that his medical condition at the time prevented him from reading the Guide or communicating a request for Plan documents. Rather, his health-care providers identified walking and driving as the work activities which were adversely affected by his condition. [Ex. D to Doc. 117-7; Ex. M to Doc. 117-16.]

Further, the evidence does not support a reasonable inference that Ms. Juarez issued the letter of February 3, 2004, for purposes of dissuading Plaintiff from returning to work, inquiring about the Plan, or accessing Plan documents. Rather, the undisputed facts and evidence of record indicate that Plaintiff already stated that he would not be returning to work on the "Status Report Form" dated January 20, 2004. [Ex. E to Doc. 117-8.] Ms. Juarez's subsequent letter was instead directed at assisting Plaintiff with his filing for Social Security benefits. [Juarez Dep. at 27; Ex. I to Doc. 117-12.]

Another equitable consideration under these circumstances is whether excusing Plaintiff from the Plan's requirement of returning to work for one day would make any difference with respect to Plaintiff's ultimate goal of obtaining disability benefits under the Plan. If he did not qualify for *benefits* regardless of whether he was eligible for *coverage*, then Ms. Juarez's misrepresentation would not be the operative factor in deterring him from obtaining such benefits.

In this regard, the Court notes Plaintiff's deposition testimony to the effect that he

thought he was being denied long-term disability benefits because of "a pre-existing disease or something." [Otero Dep. at 181, Ex. 2 to Doc. 118-3.]  The Plan language concerning pre-existing conditions fits hand-in-glove with the "Deferred Effective Date" provisions discussed above, because a "pre-existing condition" is defined by reference to a sickness or related symptom

> for which you received Medical Care during the 90 day period that ends before:
> 1.      your effective date of coverage; or
> 2.      the effective date of a Change in Coverage.

[Ex. B to Doc. 117-4, at 11; Ex. B-1 to Ex. 117-5, at 11.]

Regardless of whether the effective date of Plaintiff's coverage is deemed to commence as early as the date of his application in November 2003, and regardless of whether Plaintiff could have triggered the deferred effective date of coverage by returning to work for one full day after January 1, 2004, the fact remains that he was under medical care for the sickness or symptoms giving rise to his disability during the 90-day period leading up to those dates.  For example, Plaintiff's "Certification of Health Care Provider Form" dated December 11, 2003, indicates that he was scheduling for ongoing, monthly office visits for his medical condition after being "referred by his PCP on 8/20/02" and having his condition "confirmed from the renal biopsy in August 2002." [Ex. D to Doc. 117-7; Ex. 16 to Doc. 118-17.]  Subsequent reports in the first quarter of 2004 indicate that Plaintiff "comes in to medically scheduled [appointments] every two weeks to monitor his medical condition" [Ex. E to Doc. 117-8], and "needs to be monitored indefinitely related to Chronic Kidney Disease (CKD)." [Ex. M to Doc. 117-16.]

23

Thus, based on the reports that Defendants received from Plaintiff and his health-care providers, the sickness or related symptoms for which Plaintiff is seeking long-term disability benefits would have constituted a "pre-existing condition" under the Plan, which would have precluded such an award of benefits.  Ultimately, Plaintiff placed himself in the predicament of overcoming the "Deferred Effective Date" and "Pre-Existing Conditions" language in the Plan by waiting to apply for enrollment in the Plan until after he had already been diagnosed with, and begun treatment for, a serious medical condition.

III.   **CONCLUSION**

This case presents a close question because its outcome depends on whether Plaintiff's reliance on the misrepresentation contained in Ms. Juarez's letter dated February 3, 2004, was both *reasonable* and *detrimental* in light of the circumstances discussed above.  Viewing the admissible evidence of record and undisputed facts in the light most favorable to Plaintiff, I nevertheless conclude as a matter of law that his circumstances are distinguishable from the narrow range of cases in which ERISA permits a Court to award equitable relief in this context.

**IT IS THEREFORE ORDERED** that *Defendants' Motion for Summary Judgment* [Doc. 117] is **GRANTED**.

**IT IS FURTHER ORDERED** that *Defendants' Motion for Reconsideration on ERISA Count I* [Doc. 92] is **DENIED**.

**IT IS FURTHER ORDERED** that *Plaintiff's Motion for Leave to File Surreply* [Doc. 103] is **DENIED AS MOOT**.

24

**IT IS FURTHER ORDERED** that *Plaintiff's Motion for Leave to File Surreply Brief to Defendants' Motion for Summary Judgment* [Doc. 123] is **DENIED.**

**IT IS FURTHER ORDERED** that the **PRETRIAL CONFERENCE** set for Tuesday, February 3, 2009, at 9:00 a.m., the **CALL OF THE CALENDAR** set for Thursday, March 5, 2009, at 9:00 a.m., and the **BENCH TRIAL** set for Monday, March 9, 2009, are hereby **VACATED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED WITH PREJUDICE**.

**SO ORDERED** this 21st day of January, 2009, in Albuquerque, New Mexico.

_____

**M. CHRISTINA ARMIJO**
United States District Judge

25